IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| | ) | No. | 3:21-mj-2668 |
| v. | ) | | |
| | ) | | Magistrate Judge Frensley |
| | ) | | |
| ERIC MUNCHEL | ) | | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the Middle District of Tennessee, respectfully files this memorandum in support of pre-trial detention. The defendant, Eric MUNCHEL, traveled to Washington, D.C. to attend the "Stop the Steal" rally on or about January 6, 2021, where he intended to protest the outcome of the 2020 Presidential election. MUNCHEL was prepared for conflict: as he told a reporter, he was ready to "rise up" and "fight if necessary." After the rally concluded, MUNCHEL—who was dressed in tactical gear and carried a taser on his hip, and stashed other "weapons" in a tactical bag outside the Capitol—unlawfully entered the U.S. Capitol along with a mob of rioters who smashed windows and broke through doors. MUNCHEL gleefully acquired several sets of plastic handcuffs as he walked through the Capitol and entered the Senate chamber, where only moments earlier the Vice President of the United States was certifying the results of the 2020 Presidential election. In the Senate gallery, MUNCHEL stood with a crowd whose members shouted "Treason!" and lamented the disappearance of lawmakers from the chamber moments earlier. MUNCHEL's conduct here was dangerous and extremely serious. This Court should adopt the recommendation of the Pretrial Services Office and detain MUNCHEL pending trial.

## I.     Procedural Background

On January 10, 2021, U.S. Magistrate Judge for the District of Columbia G. Michael Harvey issued a Criminal Complaint charging MUNCHEL with one count each of Knowingly Entering or Remaining in a Restricted Building or Grounds without Lawful Authority, in violation of 18 U.S.C. § 1752(a), and Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2). MUNCHEL made his initial appearance in the Middle District of Tennessee on January 11, 2021. (ECF Doc. No. 2.) At that time, the government requested that MUNCHEL be held as a danger to the community, pursuant to 18 U.S.C. § 3142(f)(1)(A), and as a serious risk of flight, pursuant to 18 U.S.C. § 3142(f)(2)(A). (*Id.*)

On January 15, 2021, U.S. Magistrate Judge for the District of Columbia Zia M. Faruqui issued a Criminal Complaint charging MUNCHEL with the offenses above, as well as two additional offenses, namely, Conspiracy, in violation of 18 U.S.C. § 371, and Civil Disorders, in violation of 18 U.S.C. § 231(a)(3). That Complaint charges the defendant's mother, Lisa Eisenhart, with the same offenses.

The government seeks MUNCHEL's continued detention pending trial in this matter on the grounds that he is a danger to the community and a serious risk of flight.

## II.     There is Probable Cause to Believe that MUNCHEL Committed the Offenses in the Complaint

"If a defendant is charged with an offense other than a petty offense, a magistrate judge must conduct a preliminary hearing unless" the defendant waives the hearing or is indicted. Fed. R. Crim. P. 5.1(a).[1] "At the preliminary hearing, the defendant may cross-examine adverse witnesses and may introduce evidence but may not object to evidence on the ground that it was

---

[1]     There are other circumstances in which a defendant is not entitled to a preliminary hearing, but they do not apply here. *See* Fed. R. Crim. P. 5.1(a)(3)-(5).

unlawfully acquired." Fed. R. Crim. P. 5.1(e). "If the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings." *Id.*

MUNCHEL is charged by complaint, as noted, with violations of 18 U.S.C. § 371, 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a), and 40 U.S.C. § 5104(e)(2). To prove a violation of 18 U.S.C. § 231(a)(3), the government must show (1) that a civil disorder existed at the time of any alleged violation; (2) that such civil disorder was resulting in interference with a federally protected function; (3) that one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder; (4) that the defendant attempted to commit an act for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, in a violent manner with such law enforcement officer or officers; and (5) that such attempt to act was done willfully and knowingly. *United States v. Casper*, 541 F.2d 1275, 1276 (8th Cir. 1976).

To prove a violation of 18 U.S.C. § 1752(a), the government must show that the defendant's conduct satisfies at least one of the subsections of § 1752(a). At least three subsections—(a)(1) through (a)(3)—are implicated by MUNCHEL's conduct, although the Court need only find at the preliminary hearing that the government has satisfied one of these subsections to find that the government has established probable cause for a violation of § 1752(a). *See*, *e.g.*, *United States v. Bursey*, 416 F.3d 301, 309 (4th Cir. 2005) ("The Statute require[s] only that [the defendant] refrain from 'willfully and knowingly . . . enter[ing] or remain[ing] in any posted, cordoned off, or otherwise restricted area of . . . grounds where the President or other person protected by the Secret Service is or will be temporarily visiting.") (alterations in original). Furthermore, under 18 U.S.C. § 1752(b)(1)(A), a defendant, as here, is subject to a statutory

- 3 -

maximum penalty of ten years if he, "during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm."

To prove a violation of 40 U.S.C. § 5104(e)(2), the government must show that the defendant's conduct satisfies at least one of the subsections of § 5104(e)(2). At least five subsections—(A), (B), (C), (D), and (G)—are implicated by MUNCHEL's conduct, although the Court need only find at the preliminary hearing that the government has satisfied one of these subsections to find that the government has established probable cause for a violation of § 5104(e)(2).

Lastly, to prove a violation of 18 U.S.C. § 371, the government must show "an agreement willfully formed between two or more persons to commit an offense"—here, violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a), and/or 40 U.S.C. § 5104(e)—"attended by an act of one or more of the conspirators to effect the object of the conspiracy." *United States v. Dolt*, 27 F.3d 235, 238-39 (6th Cir. 1994); *see also* Sixth Circuit Pattern Jury Instr. 3.01A ("Conspiracy to Commit an Offense—Basic Elements").

Here, the government has submitted a statement in support of the criminal complaint establishing probable cause to believe that MUNCHEL, while dressed in tactical gear and carrying a taser and plastic handcuffs, roamed the U.S. Capitol for the purpose of, at a minimum, disrupting the counting of the Electoral College vote, over which Vice President Mike Pence was presiding. The allegations underlying the complaint also establish that MUNCHEL and Eisenhart followed after two Capitol Police officers while carrying these handcuffs, and that Eisenhart appears to have shouted at the officers while leaning over a banister. At the preliminary hearing, the government anticipates calling a law enforcement witness to adopt the representations in the statement in

support of the criminal complaint and to provide additional information regarding MUNCHEL's conduct in this case. That witness will also be available for cross-examination by the defense.

Presuming that the government establishes probable cause to believe that MUNCHEL committed violations of 18 U.S.C. § 371, 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a), and 40 U.S.C. § 5104(e)(2), the government also anticipates that it will establish that detention is appropriate under 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A), for the reasons below.

## III.  LEGAL PRINCIPLES GOVERNING REQUESTS FOR DETENTION

### A.  STATUTORY BASES FOR DETENTION

There are at least three statutory bases for detention in this case. First, this Court may detain a defendant upon motion of the attorney for the Government in a case that involves a crime of violence. 18 U.S.C. § 3142(f)(1)(A). The term "crime of violence" means, among other things, "any . . . offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b). Committing a violation of 18 U.S.C. § 1752(a) by using a dangerous or deadly weapon as outlined in § 1752(b)(1)(A) makes this case one that involves a crime of violence.

Second, the Court may detain a defendant upon motion of the attorney for the Government in a case that involves "any felony that is not otherwise a crime of violence . . . that involves the possession or use of a firearm or destructive device . . . or any other dangerous weapon . . . ." 18 U.S.C. § 3142(f)(1)(E). Thus, even assuming that this Court found § 1752(a) not to be a crime of violence, it is nevertheless a felony (on the facts alleged here) that involves the possession or use of a dangerous weapon, namely, a taser.

- 5 -

Lastly, the Court may detain a defendant upon motion of the attorney for the Government in a case that involves a serious risk that such person will flee. 18 U.S.C. § 3142(f)(2)(A).

### B. FACTORS JUSTIFYING DETENTION

The government bears the burden of persuasion on the issue of pretrial detention. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). In determining whether the government has met its burden of persuasion, this Court must consider four factors: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(b); *Stone*, 608 F.3d at 945. When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

For the reasons below, these factors weigh in favor of detention in this case.

- 6 -

## IV.    FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE CHARGE AGAINST DEFENDANT MUNCHEL[2]

### A.    The Events of January 6, 2021

On or about January 4, 2021, MUNCHEL and Eisenhart traveled from Nashville to the Grand Hyatt Hotel in Washington, D.C., to participate in the "Stop the Steal" rally scheduled for January 6, 2021. (Subpoenaed records from the Grand Hyatt Hotel in Washington, D.C. establish that Eisenhart rented a hotel room on January 4, 2021, and that she checked out of the room on January 7, 2021.) MUNCHEL and Eisenhart made no secret of their intentions in traveling to Washington: they told a reporter for The Sunday Times that they made the trip because they "wanted to show that we're willing to rise up, band together[,] and fight if necessary. Same as our forefathers, who established this country in 1776." (*See* Exh. A, The Sunday Times Article.) MUNCHEL thus perceived himself to be a revolutionary, in the mold of those who overthrew the British government in the American Revolution.

On January 6, 2021—the day of the rally—the exterior plaza of the U.S. Capitol was closed to members of the public, because a joint session of the United States Congress had convened at the United States Capitol. The Capitol is located at First Street, SE, in Washington, D.C., and is secured 24 hours a day by Capitol Police. Restrictions around the Capitol include permanent and

---

[2]    "[C]onducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court." *Stone*, 608 F.3d at 949-50 (citation omitted); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer.") (citing cases). Here, because MUNCHEL is entitled to a preliminary hearing, the government anticipates introducing testimonial and documentary evidence in addition to the proffered evidence outlined below. The government notes further that the investigation in this case is a developing one, and that the government continues to learn new information on a near-daily basis. To the extent that the government learns any information affecting the representations in this filing in a material way, the government will apprise the Court of that information.

- 7 -

temporary security barriers and posts manned by Capitol Police. Only authorized people with appropriate identification are allowed access inside the Capitol.

During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Vice President Mike Pence was presiding in the Senate chamber.

Meanwhile, attendees at the "Stop the Steal" rally, including MUNCHEL and Eisenhart, began making their way to the Capitol. MUNCHEL later explained to the Times reporter that his actions in marching to and entering the Capitol were intended as a show of force: he said that their storming of the Capitol was "a kind of flexing of muscles." MUNCHEL claimed, however, that by entering the Capitol, he did not intend to "fight the police"; he said instead that "[t]he point of getting inside the building is to show them that we can, and we will."

With the joint session underway and with Vice President Mike Pence presiding, a large crowd, including MUNCHEL and Eisenhart, gathered outside the Capitol. Temporary and permanent barricades surround the exterior of the Capitol. Capitol police were present and attempting to keep the crowd away from the Capitol buildings and the proceedings underway inside. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the Capitol Police, and the crowd advanced to the exterior façade of the building. At such time, the joint session was still underway and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the Capitol Police attempted to maintain order and keep the crowd from entering the Capitol. Shortly after 2:00 p.m., however, individuals in the crowd forced entry into the Capitol, including by breaking windows.

- 8 -

MUNCHEL and Eisenhart were among the persons who entered the Capitol. Eisenhart claimed to the Times reporter that she and MUNCHEL entered the Capitol as "observers," and that MUNCHEL told Eisenhart not to touch anything while inside. But when MUNCHEL entered the Capitol, he was dressed for combat: he wore combat boots, military fatigues, a tactical vest, gloves, and a gaiter that covered all of his face except for his eyes. MUNCHEL had also armed himself with a taser on his hip. And MUNCHEL had mounted a red iPhone to his chest, ostensibly to record the events that day:

 

Eisenhart was dressed for combat as well, wearing a tactical vest over her flannel shirt:



In the photograph depicting MUNCHEL and Eisenhart before they entered the Capitol, neither of them was carrying plastic handcuffs, also known as "flex cuffs." But still captures of

surveillance video inside the Capitol depict both MUNCHEL and Eisenhart carrying white plastic handcuffs:



The photograph of MUNCHEL hopping a guardrail in the Senate chamber also depicts MUNCHEL carrying white plastic handcuffs. And at no point in their conversation with the Times reporter did MUNCHEL or Eisenhart mention that they both carried plastic handcuffs through the halls of Congress. Notably, MUNCHEL told the Times reporter that he had left his guns in Tennessee because of the "strict" guns laws in Washington—the implication being that MUNCHEL *would* have been armed with a firearm had Washington's gun laws not been in place. And, as described below, there is evidence that MUNCHEL and Eisenhart *were* armed with firearms when they came to Washington for the rally.

MUNCHEL and Eisenhart left Washington, D.C. for Nashville on January 7, 2021. But MUNCHEL and Eisenhart made clear in their interview with the Times that they have no intention of abandoning their goals of revolution. MUNCHEL lamented the ability of pro-Trump groups to organize, in part due to their removal from mainstream social media sites. Eisenhart agreed, explaining that "The left has everything: the media, organizations, the government. We have to

- 10 -

organize if we're going to fight back and be heard." Eisenhart, furthermore, made clear that she was willing to die for that cause, explaining: "This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight."

**B.   Identification of MUNCHEL and Eisenhart**

On the evening of January 8, 2021, persons using social media began identifying various clues on social media and elsewhere, which pointed to MUNCHEL as the person depicted in the Senate chamber wearing tactical gear and carrying plastic handcuffs. In the photographs above, MUNCHEL is wearing or displaying several distinctive items, including: (1) a black baseball cap depicting a rifle and a flag, with writing on the left side of the cap near the back of the cap; (2) a patch on the center of his chest displaying the "Punisher" comic book character, as well as a Tennessee "thin blue line" patch depicting the State of Tennessee bisected by a horizontal blue line; and (3) a long-sleeve shirt in a fatigues pattern with black rectangles on the upper sleeves. MUNCHEL is also depicted walking alongside Eisenhart outside the Capitol, wearing the same distinctive clothing he is depicted wearing in the Senate chamber.

MUNCHEL also maintains or maintained a Facebook page. As of approximately January 9, 2021, MUNCHEL's profile on Facebook appeared as follows:

- 11 -



MUNCHEL's Facebook page was taken down in the late evening hours on January 8, 2021, and is no longer accessible.

MUNCHEL is depicted in the circular Facebook photo above wearing what appears to be a white t-shirt with the words "Kid Rock" or something similar on the left breast. "Kid Rock's Big Ass Honky Tonk" is a bar located in downtown Nashville, Tennessee. On an Instagram post from August 18, 2020, MUNCHEL is depicted wearing what appears to be a white t-shirt with the words "Kid Rock" or something similar on the left breast. MUNCHEL also appears to have one or more brown wristbands on his right wrist:



Before MUNCHEL's Facebook page was taken down, various actors on social media sought to capture screen shots of MUNCHEL depicted online. Those screen shots included a

photograph of MUNCHEL in downtown Nashville draped in an American flag; wearing a baseball cap depicting a rifle and a flag; wearing one or more brown wristbands on his right wrist; and carrying an item in a wraparound holster on his right thigh:



Those screen shots also included MUNCHEL, holding an American flag and a shotgun, standing in front of a television playing a statement by President Trump; a baseball cap depicting a rifle and a flag is resting on a small desk behind him; and wearing one or more brown wristbands on his right wrist:



On or about January 6, 2021, after the riot at the Capitol, MUNCHEL was also recorded on a LiveStream video in the lobby of the Grand Hyatt. Screen captures of that video, reproduced below, depict MUNCHEL wearing a long-sleeved shirt in a fatigues pattern with black rectangle on the upper sleeves, and a dark baseball cap with writing on the left side of the cap near the back of the cap:




Law enforcement officers also had an encounter with MUNCHEL in the area of the Grand Hyatt Hotel. One of the officers observed a black holster on MUNCHEL's right hip, along with the black grip of what appeared to the officer at that time to be a firearm. Officers spoke with MUNCHEL, who permitted the officers to remove the item from the holster. Officers determined the item to be a black and yellow "Taser Pulse" taser, which was designed to administer an electrical shock. MUNCHEL informed the officers that he possessed the taser for his own protection as he participated in what he described as the First Amendment assemblies at the pro-Trump rally. MUNCHEL was identified at that time by his Tennessee concealed weapons permit. The home address listed for MUNCHEL in the Metropolitan Police Department's police paperwork as a result of this police contact and taser seizure, furthermore, is nearly identical to MUNCHEL's actual address in Nashville.

### C. <u>Search Warrant Execution and Additional Investigation</u>

Based in part upon the information above, the government obtained a federal search warrant for MUNCHEL's residence in Nashville on January 9, 2021. Federal agents began visual surveillance of the residence that same day. At approximately 6:00 p.m., a federal agent observed a person the agent believed to be MUNCHEL arrive in a red Kia Sentra registered to Eisenhart and enter the residence. At approximately 6:00 a.m. on January 10, 2021, FBI agents with the Joint Terrorism Task Force executed the search warrant at the residence. MUNCHEL was not present.

- 14 -

As it turned out, the person whom agents had observed arrive the night before was not MUNCHEL but a relative of MUNCHEL's ("W-1").

During an interview with W-1 that followed, W-1 informed agents that W-1 and MUNCHEL lived at the residence. W-1 informed agents further that MUNCHEL and Eisenhart traveled to Washington, D.C. on or about January 6, 2021, to attend the pro-Trump rally scheduled on that date. W-1 informed agents that W-1 did not travel to Washington, D.C. with MUNCHEL and Eisenhart, and instead remained in Nashville.

W-1 informed agents that MUNCHEL and Eisenhart returned from Washington, D.C. to the residence on January 7, 2021. W-1 informed agents that Eisenhart left the residence on January 8, 2021. W-1 informed agents further that MUNCHEL left the residence on the morning of January 9, 2021, and informed W-1 that he was going to work. Some time later that day, MUNCHEL's manager called W-1, inquiring about MUNCHEL's whereabouts, as MUNCHEL had not come into work that day. W-1 later spoke with MUNCHEL by telephone; MUNCHEL told W-1 that he was "OK," but did not offer additional details about where he was located or whether he was with anyone.

Inside the residence, agents located the items MUNCHEL was depicted wearing in the photograph above in the Senate chamber, including the tactical vest with a patch on the center of the chest displaying the "Punisher" comic book character and the Tennessee "thin blue line" patch depicting the State of Tennessee bisected by a horizontal blue line; a baseball cap depicting a rifle and a flag, with writing on the left side of the cap near the back of the cap; and five pairs of white plastic handcuffs:

  

Agents recovered a second tactical vest as well, which appears similar, if not identical, to the vest Eisenhart appeared to be wearing at the Capitol. W-1 informed agents that all of these items belonged to MUNCHEL. W-1 informed agents that a bedroom inside the residence was MUNCHEL's bedroom. Agents located a black Stack-On safe, standing approximately 5 feet tall, inside that bedroom. Inside a closet in the bedroom, agents also located a .22 caliber revolver. Agents also located dozens of rounds of ammunition inside the bedroom, along with multiple empty and full magazines.

Based on the information above, the government obtained a federal search warrant to search the premises, as well as the black Stack-On safe located inside the premises, for (among other things) firearms, firearms, parts and ammunition. During a search of the black Stack-On safe, agents located approximately 15 firearms, including assault rifles, a sniper rifle with a tripod, other rifles, shotguns, and pistols, and hundreds of rounds of ammunition. Agents also located a drum-style magazine elsewhere in the residence. A photograph of these items is below:



Agents did not recover any cell phones during their search of the residence. But agents learned that MUNCHEL had provided a red iPhone to a friend, W-2, for "safekeeping." W-2 also reported that MUNCHEL told W-2 that the photograph that had been circulating of a male wearing tactical gear and jumping over a railing in the U.S. Senate chamber was MUNCHEL. Agents later seized that red iPhone as evidence.

###### D.    The Videotape

Law enforcement recovered a video that MUNCHEL took on his iPhone on January 6, 2021. That video—captured using the cell phone MUNCHEL mounted to his chest—depicts MUNCHEL standing with Eisenhart in a large crowd outside the Capitol. As MUNCHEL and Eisenhart make their way to the Capitol, they encounter several members of the "Oathkeepers," a militia group that is distrustful of government authority. One of the Oathkeepers says, "There's 65 more of us coming." MUNCHEL, when he recognizes them, says in affirmation, "Oathkeepers," and bumps fists with one of the men.

It is clear at that point in the video that persons are entering, or attempting to enter, the Capitol. At that time, Eisenhart says, "We're going straight to federal prison if we go in there with weapons." MUNCHEL says words to the effect of, "Yeah, that's why I'm not going in there." Eisenhart replies, "Let's go put it—we can put 'em in the backpacks." MUNCHEL and Eisenhart then walk towards a low stone wall, where MUNCHEL sets up plastic chairs and encourages protestors to climb over the wall towards the Capitol and helps them do so. Eisenhart likewise encourages protesters to enter the Capitol, exhorting them, "Yeah, go up in there. You can go up in there now." Moments later, MUNCHEL says he needs to "take my weapons off before I go in there." MUNCHEL and Eisenhart retreat through the crowd, to a location where a tactical bag and other items appear to have been stashed. At that location, MUNCHEL and Eisenhart take items off of their person and deposit those items in or near the bag. Eisenhart can then be heard to say, "We're going in," "the [tear] gas isn't bad," and "Let's go in, let's go in."

As MUNCHEL and Eisenhart get closer to the Capitol, an unknown woman can be heard to make a reference to "treason." MUNCHEL replies, "Hell yeah it is." As they push through the crowd, Eisenhart engages with a rioter who tells her that he was "maced," and that he "punched two of them in the face," to which Eisenhart replies, "Good." Eisenhart says further, "While everyone else is on their couch, you guys are training, and getting ready for it." Eisenhart also tells MUNCHEL that someone in the crowd was saying that the events at the Capitol were "on the news"; MUNCHEL replies in part, "Oh yeah." MUNCHEL says further, "They're gonna use this against us as hard as they can." Eisenhart replies, "I don't care, that's fine, I don't care." MUNCHEL asserts, "We ain't playing fucking nice no god damn more." Eisenhart replies, "That's right." Moments later, a person in the crowd tells MUNCHEL and Eisenhart, "You guys look like y'all ready to go." MUNCHEL replies, "Fucking ready to fuck shit up."

As MUNCHEL and Eisenhart approach the Capitol, a man can be heard shouting, "Congress is shut down! Tear gas packages thrown in the Congress!" Eisenhart exclaims, "They got tear-gassed, motherfuckers! Oh my God. That is [unintelligible] my best day, to know that they got tear-gassed." Other people in the crowd can be heard screaming, "Fuck that, this is our house!" As MUNCHEL and Eisenhart crawl through a broken metal guardrail outside the Capitol, MUNCHEL can also be heard saying, "Hell yeah, baby!"

As MUNCHEL and Eisenhart approach the exterior of the Capitol, Eisenhart remarks, "The story of how we got in is going to be great—who got us in the house." MUNCHEL replies, "Probably the last time I'll be able to enter the building with armor and . . . fucking weapons." It is then possible to hear the sounds of shattering glass and breaking windows, at which time MUNCHEL shouts, "I guess they thought we were playing!" MUNCHEL and Eisenhart then enter the Capitol amidst a throng of protestors and make their way to the upstairs level. They encounter a man shouting, "Treason!" into a bullhorn, and Eisenhart joins the chant. MUNCHEL informs various rioters, "Don't break shit," and "No vandalizing shit," and "We ain't no god damn Antifa, motherfuckers."

At one point, MUNCHEL spots plastic handcuffs on a table inside a hallway in the Capitol. MUNCHEL exclaims, "Zipties. I need to get me some of them motherfuckers," and grabs several white plastic handcuffs from on top of a cabinet (but leaves many others). MUNCHEL then follows after Eisenhart, who is carrying a handcuff as well, to a staircase near the entrance to the Senate gallery; it appears from Capitol surveillance video that Eisenhart is following after two Capitol Police officers who had just encountered a mob outside the entrance to the Senate gallery. Eisenhart shouts from the banister, "Freedom!" "Traitors!" "We want a fair election!" and "We want rule of law!" MUNCHEL and Eisenhart then enter the Senate gallery; chillingly, persons in

the crowd can be heard shouting, "Anybody home?" "They went into the tunnels," "Where'd you go?" "They're cowards!" "Are you afraid?" and "Treason!" Eisenhart is depicted shouting "Treason!" as well. Just before MUNCHEL and Eisenhart leave the gallery, MUNCHEL shouts, "I want that fucking gavel!" Lastly, as MUNCHEL and Eisenhart are attempting to leave, Eisenhart says words to the effect of, "Don't carry the zip ties, just get 'em out of their hand, out of [unintelligible] get 'em out of our hands."

## V.   THIS COURT SHOULD DETAIN DEFENDANT MUNCHEL AS A DANGER TO THE COMMUNITY AND AS A SERIOUS FLIGHT RISK

The government has met its burden of showing that there is clear and convincing evidence that MUNCHEL should be detained pending trial to ensure the safety of the community. The government has also met its burden of showing by a preponderance of the evidence that MUNCHEL poses a serious risk of flight.

### A.   Defendant MUNCHEL is Charged with a Serious Offense

The nature and circumstances of the offense charged in this case militate strongly in favor of detention. MUNCHEL has been charged with an extremely serious offense, arising from his entry into the Capitol with a violent mob while dressed in tactical gear and armed with a taser, to disrupt the counting of the Electoral College votes from the 2020 Presidential election. MUNCHEL also seized several pairs of white plastic handcuffs and carried them around with him while inside the Capitol; he appears to have brought them back to Nashville with him, perhaps as trophies. MUNCHEL also made statements evincing an intent to engage in violent conduct because of his disillusionment with the outcome of the 2020 Presidential election. And the uprising MUNCHEL engaged in has also resulted in at least five deaths, including of a Capitol police officer who died after engaging in a physical confrontation with members of the mob.

In considering the nature and circumstances of the offense, the Court should also weigh the possible penalty MUNCHEL faces upon conviction. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). Here, MUNCHEL faces a statutory maximum term of imprisonment of 20 years, if convicted of the charges in the complaint. This time period represents a substantial penalty, which would serve as powerful motivation for MUNCHEL to flee the jurisdiction were he to be released. This factor thus weighs in favor of detention.

**B.**     **The Evidence of MUNCHEL's Dangerousness is Strong[3]**

The weight of the evidence of MUNCHEL's dangerousness is strong. As set forth more fully in Section V.C below, MUNCHEL has a history of contacts with law enforcement. MUNCHEL's conduct underlying the instant offense—which includes MUNCHEL stashing unknown "weapons" before entering the Capitol, carrying a taser on his person into the Senate gallery, and seizing handcuffs as he and others stormed the building—also demonstrates the danger he poses to the community if released. This factor thus weighs in favor of detention as well.

**C.**     **History and Characteristics of the Defendant**

MUNCHEL has had several prior contacts with law enforcement. According to the Pretrial Services Report, MUNCHEL was arrested for possession of less than one ounce of marijuana in Fulton County, Georgia, on November 24, 2011. That case was dismissed on June 30, 2014. MUNCHEL was again arrested for possession of less than one ounce of marijuana, in Dunwoody, Georgia, on March 24, 2013. MUNCHEL was convicted on April 29, 2014, and sentenced to 12 months' probation. MUNCHEL was arrested for battery in Fulton County on May 30, 2013. That case was dismissed on August 5, 2015. Lastly, MUNCHEL was arrested for possession of less than one ounce of marijuana in Dunwoody on March 27, 2014. He failed to appear on March 31,

---

[3]     "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (citation omitted).

2014, although it appears that he was not prosecuted for that violation. He pled guilty to the possession offense on April 29, 2014, and was sentenced to 12 months' probation.[4] MUNCHEL thus has a history, although it is not extensive, of contacts with law enforcement, including multiple convictions for misdemeanor drug offenses and at least one instance of failing to appear for a court proceeding. This factor thus weighs in favor of detention as well.

### D. MUNCHEL Poses a Danger to the Community if Released

For reasons already cited related to the charged conduct, MUNCHEL poses a serious danger to the community. His release in this case would therefore compromise the safety of the general public. This factor thus weighs in favor of detention as well.

### E. Risk of Flight

As noted, MUNCHEL faces a significant statutory maximum penalty if he is convicted of the charges in the complaint. MUNCHEL also has a record of failing to appear on at least one prior occasion in a state-court matter. Furthermore, MUNCHEL took steps in this case to evade detection by law enforcement. When it became clear he was a suspect in this case, he deactivated his Facebook account; gave his cell phone to an associate; and left his residence and failed to show up for his job without telling W-1 where he was going. MUNCHEL only turned himself in to law enforcement when it became clear that the FBI had searched his residence and had an arrest warrant for him—in other words, when his apprehension was all but inevitable. For these reasons, this Court should find by a preponderance of the evidence that MUNCHEL poses a serious risk of flight, and detain him on that basis.

---

[4] The representations in this section are based upon the government's review of the Pretrial Services Report, the National Crime Information Center record for the defendant, Tennessee law enforcement databases, and other criminal history materials for the defendant. The government has not yet obtained certified copies of all of the defendant's prior convictions.

## VI. CONCLUSION

For the foregoing reasons, as well as any reasons which may be set forth at a hearing on this motion, the government respectfully submits that there exists no condition or combination of conditions which would assure the safety of any person or the community, or which would ensure the defendant's appearance at his court hearings. Accordingly, the government requests that the Court order the defendant detained pending trial.

In the event that the Court elects to release MUNCHEL pending trial, the government makes two requests. First, the government requests that the Court include in its release order that the defendant (1) be ordered to wear a GPS tracking device; (2) stay away from Washington, D.C., unless he is appearing for court, meeting with pretrial services, or consulting with his attorney; (3) call pretrial services once per week; (4) advise pretrial services of any travel he intends to undertake within the United States outside of the Middle District of Tennessee; (5) not travel outside of the continental United States without court approval; and (6) participate in all future proceedings as directed. Second, the government requests that the Court stay any release order so that the government may file a motion for revocation of the release order with the court having original jurisdiction over the offenses, namely, the United States District Court for the District of Columbia, pursuant to 18 U.S.C. § 3145(a).

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney

By:      /s/ Ben Schrader
BEN SCHRADER
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
(615) 401-6615

Dated:         January 20, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2021, I sent a copy of the foregoing via the Court's

electronic filing system to Caryll Alpert, Esq., counsel for the defendant.


_____*s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney